Joe **NATONABAH** et al., Plaintiffs,

v.

**BOARD OF EDUCATION OF the GAL-LUP–McKINLEY COUNTY SCHOOL DISTRICT et al., Defendants.**

Civ. No. 8925.

United States District Court,
D. New Mexico.

Feb. 8, 1973.

Richard B. Collins, Jr., Alan C. Stay, Donald Juneau, Stephen A. Harvey, Bruce Bridegroom, Alan Taradash, Window Rock, Ariz., Daniel M. Rosenfelt, Harvard Center for Education, Cambridge, Mass., Paul Biderman, James Wechsler, Crownpoint, N. M., Richard C. Bosson, Albuquerque, N. M., Mark G. Yudof, Cambridge, Mass., Charles F. Wilkinson, Boulder, Colo., for plaintiffs.

E. P. Ripley, Sp. Asst. Atty. Gen., State Dept. of Education, Santa Fe, N. M., for Leonard J. De Layo.

W. R. Hughes, Asst. U. S. Atty., Victor R. Ortega, U. S. Atty., Albuquerque, N. M., Peter Brickfield, Atty. Dept. of Justice, Civil Division, General Litigation Section, Washington, D. C., for United States, Elliot L. Richardson and Sidney P. Marland.

John E. Perry, Gallup, N. M., for John H. Schuelke, Cal W. Foutz, Earnest C. Becenti, John C. Martin, Abe Plummer, A. C. Woodburn and Board of Education of Gallup-McKinley County School Dist.

Olmsted, Cohen and Bingaman, Jeff Bingaman, Santa Fe, N. M., for Leonard J. DeLayo.

## MEMORANDUM OPINION

BRATTON, District Judge.

This is a class action for declaratory and injunctive relief brought pursuant to 42 U.S.C.A. §§ 1981–83 and 28 U.S.C.A. §§ 1361, 2201–02. The plaintiffs are Navajo Indian children, who, through their parents, are suing in their own behalf and in behalf of all other Indian students who attend schools in the Gallup-McKinley County School District. Alleged are discrimination against them on the basis of race and diversion of federal monies allocated to the school district exclusively for the benefit of Indian children, to-wit: Johnson-O'Malley funds, granted pursuant to 25 U.S.C.A. § 452 to be used generally for the education of Indian children, and Title I funds, granted pursuant to 20 U.S.C.A. § 241a to be used for the special educational needs of children of low-income families who are, in the Gallup-McKinley County School District, overwhelmingly Indian children.

The Gallup-McKinley County Board of Education, the Superintendent of Schools, A. C. Woodburn (hereinafter referred to as the local defendants) and the state Superintendent of Public Instruction, Leonard DeLayo (hereinafter referred to as the state defendant) are charged with racial discrimination against the plaintiffs and their class in denial of their right of equal protection because of these defendants' allocation of local and state monies, and federal Impact Aid monies. The local defendants are also charged with having violated the provisions of 20 U.S.C.A. § 241a (hereinafter denominated Title I) and 25 U.S.C.A. § 452 (hereinafter referred to as Johnson-O'Malley) by use of funds obtained thereunder for purposes not authorized by those Acts and their regulations.

Also joined as defendants are Elliot Richardson, the Secretary of Health, Education and Welfare, Sidney P. Marland, Commissioner of the United States Office of Education, and Rogers C. B. Morton, Secretary of the Interior (hereinafter referred to as the federal defendants). These defendants and the state defendant are sued for their alleged failure to establish proper review and monitoring procedures for the expenditures of monies received by the Gallup-McKinley County School District under Title I and Johnson-O'Malley.

All defendants are sued individually and in their official capacities with regard to all allegations against them.

The present case has its genesis in the publication *An Even Chance*. This pam-

phlet, denominated "a report on Federal funds for Indian children in public school districts," was prepared by the N.A.A.C.P. Legal Defense and Educational Fund, Incorporated, with the cooperation of Harvard University's Center for Law and Education, and was published in January of 1971.

*An Even Chance* is essentially a critique of the spending of federal monies paid to school districts because of the presence of Indian children in such districts. With regard to the Gallup-McKinley County School District, it charges that Indian children receive an inferior and substandard education and that of all the districts surveyed, this district provides the clearest example of inequalities between predominantly Indian and non-Indian schools. Its specific allegations furnish the basis of the plaintiffs' complaint herein with regard to federal financial assistance programs to the Gallup-McKinley County District.

The publication evoked an immediate response from the state, and an on-site investigation was conducted in February of 1971 by staff members of the State Department of Education. Their report, "The Response to An Even Chance," was subsequently published. As will be seen below, the state found certain problems touched on by *An Even Chance* to exist in the district and made certain recommendations concerning them to the district.

The Gallup-McKinley School District was formed in 1958, when the county schools were consolidated with those of the City of Gallup into one district. At that time, there were very few Indian children in the schools of either district. Ninety percent of the Indian children who attended school in the area did so in schools operated by the Bureau of Indian Affairs.

Since 1958 the enrollment of Indian students in the district's schools has increased steadily, so that, at the present time, over 7,000 of the 12,000 students enrolled are Indian students.

The school district encompasses an area of approximately 5,000 square miles, and the only town of any size within this very large district is the City of Gallup. The district contains nineteen elementary schools and seven secondary schools. Nine of the elementary schools and three of the secondary schools are located in the City of Gallup. The district also has one special education facility in the City of Gallup and one very small twin-classroom facility at Ambrosia Lake.

The following facts are reflected by a review of the present composition of the district's schools.[1] Indian students are

1. Identified below are the enrollments of schools, by location, with the exception of the Wilson School and Ambrosia Lake.

| Rural Schools | | | | Gallup City Schools | | | |
|---|---|---|---|---|---|---|---|
| Elementary | Total Enroll. | Indian Enroll. | % Indian | Schools | Total Enroll. | Indian Enroll. | % Indian |
| Zuni | 541 | 536 | 99.1 | Washington | 457 | 223 | 48.8 |
| Church Rock | 378 | 371 | 98.1 | Aileen Roat | 440 | 191 | 43.4 |
| Navajo | 334 | 323 | 96.7 | Sunnyside | 171 | 74 | 43.3 |
| Tohatchi | 670 | 636 | 94.9 | Lincoln | 409 | 159 | 38.9 |
| Crownpoint | 707 | 659 | 93.2 | * Red Rock | 456 | 170 | 37.3 |
| Towa Yallane | 442 | 391 | 88.5 | * Indian Hills | 347 | 127 | 36.6 |
| Tse Bonito | 190 | 163 | 85.8 | * Jefferson | 388 | 129 | 33.2 |
| Thoreau | 686 | 550 | 80.2 | Sky City | 140 | 33 | 23.6 |
| Ramah | 279 | 221 | 70.2 | * Roosevelt | 280 | 59 | 21.1 |
| Secondary | | | | | | | |
| Tohatchi J.S.H.S. | 446 | 420 | 94.2 | * J.F.K. J.H. | 812 | 334 | 41.1 |
| Crownpoint J.S.H.S. | 492 | 458 | 92.1 | * Gallup S.H. | 1429 | 484 | 33.9 |
| Zuni J.S.H.S. | 672 | 582 | 86.6 | * Gallup J.H. | 761 | 250 | 32.9 |
| Thoreau J.S.H.S. | 471 | 319 | 67.6 | | | | |

* Denotes non-Title I school

enrolled in all of the city's schools, but they comprise a majority in none of them. Indian students comprise an overwhelming majority of all students enrolled in the remaining rural schools. All of the district's rural schools are Title I target schools, while only five of the city schools receive Title I money. Roughly ninety percent of the Indian children in elementary school are enrolled in Title I schools while nearly sixty-three percent of the Indian students enrolled in secondary schools attend Title I schools.

At the present time, the district's financial resources are derived from several sources. Roughly seventy-five percent of its yearly funds come from the state of New Mexico. From county and district sources comes a very small amount of money. As indicated above, the balance of the district's funds is derived from federal sources. The district receives Impact Aid funds, granted pursuant to 20 U.S.C.A. §§ 236–40, to compensate it for the tax loss it suffers due to the non-taxable Indian lands in the district. It also receives Title I funds, allocated to the district to provide supplemental educational programs to educationally deprived children. Finally, it receives Johnson-O'Malley funds for Indian educational purposes.

For practical purposes, the district's construction program is funded from its bond issues, and its operational expenditures are funded from monies allocated to it by the state and from Impact Aid funds. The district formerly had funds with which to build schools from P.L. 815, 20 U.S.C.A. § 644, but no funds have been made available to it for school construction under this Act for the last five years.

The district's school board has the responsibility for disbursement of the local and state monies and the Impact Aid monies for operational requirements. It also is the authority which decides how and where construction monies shall be spent. As for Title I and Johnson-O'Malley programs, it is the agency which designs such programs for the district and submits applications for them to the proper state or federal authority.

It is the way in which the local defendants have discharged their responsibilities with regard to the disbursement of these funds that plaintiffs are challenging.

With regard to construction funds, i. e., bonding capacity, the plaintiffs claim that the local defendants have consistently allocated them to benefit the non-Indian students. With regard to the operational funds, the plaintiffs claim that the local defendants have failed to allocate such funds fairly between Indian and non-Indian students, with the result that Indian students have received less than their share of the goods and services for which such funds are expended.

The federal financial assistance programs authorized under Title I and Johnson–O'Malley in the district are primarily challenged by the plaintiffs as supplanting basic support programs. In essence, the claim is that Title I and Johnson-O'Malley monies allocated to the district are being used to pay for programs for which operational funds from state and local monies and Impact Aid monies should be spent, with the result that Indian students get less than their share of operational funds, non-Indian students get more than their share of operational funds, and Title I and Johnson-O'Malley funds are used in lieu of operational funds to furnish basic support services to Indian students.

## I.

▮ The first question presented is whether the local and state defendants have discriminated against the plaintiffs and their class in the expenditure of money for building construction, equipment, operational and instructional services, and in the alleged practice of overcrowding in the predominantly Indian schools.

The plaintiffs initially filed discrimination charges against the federal defendants as well as the local defendants and the state. At the close of the trial

plaintiffs moved to dismiss the federal defendants as to this allegation, and the motion was granted. The United States thereafter filed a brief *amicus curiae* on the discrimination issue. Its conclusion as a result of analyzing the evidence was that there have been and are unjustified disparities by the local board favoring non-Indian students in the allocation of resources in the district with the result that the plaintiffs have been denied equal protection of the laws.

The first practice upon which the claim of discrimination is premised is plaintiffs' evidence concerning building construction expenditures. Here, as in their other proofs, the plaintiffs utilized the weighted average method, which accounts for the differences in Indian enrollments among the schools of the district and which constitutes a valid tool to utilize in assessing the realities of the situation. Taking the statement of values of the district's school buildings that was prepared in 1972 for the district for insurance coverage purposes, the plaintiffs' Certified Public Accountant applied to it a weighted average. The result of his computations showed a significant difference in per-pupil building valuations that was favorable to the non-Indian students.

Plaintiffs presented two alternative sets of calculations. In the first such set, the accountant did not include teacherages purchased for rural areas or some of the district's portable classrooms, the location of which the accountant was unable to ascertain. Included, however, were many portable classrooms which were purchased with Title I or Johnson-O'Malley funds. This set of calculations produced a valuation of $1,205.00 per Indian student as opposed to a valuation of $1,425.00 per non-Indian student, or a disparity of $220.00 (18 percent) per student. In his second set of calculations, the accountant included all portable classrooms and teacherages and allocated such values only to Indian students. Even under this calculation, the resulting disparity unfavorable to the Indian students was 15 percent per student or $800,000.00.

Since its consolidation in 1958, the district has relied almost totally on federal funding under P.L. 815 for school construction and facilities everywhere except in the City of Gallup. It has kept itself bonded to capacity, but, with the exception of money spent for one elementary school located on the reservation, all of its bond money has been spent to meet building needs in Gallup.

For the past several years, federal money for school construction under P.L. 815 has not been available, and the district has furnished only portable classrooms to the rural predominately Indian areas to meet their needs. Many of these classrooms have been purchased with Johnson-O'Malley or Title I funds. Supporting facilities, e. g., cafeterias and restrooms, have not been furnished.

Only recently the local defendants, in their plea to Congress for P.L. 815 funds, stated that predominantly Indian schools are overcrowded as to classroom space and all supporting facilities and that Indian education in the district is deteriorating.[2]

The local defendants take the position that it is not only their obligation but also the obligation of the federal government to furnish construction money for the rural Indian schools. They also assert that, since P.L. 815 money is properly included in school construction monies, the evidence shows that the rural areas actually have been accorded 60 percent of the construction money available since 1965. It is also contended that the evidence shows that the district has increased seating capacities in the Indian schools equally with the increase in seating capacity in the Gallup schools. Finally, it is pointed out that, until 1970, only property owners could vote on bond issues, so that it was impossible as a practical matter to get a bond issue passed that would inure to the benefit of any area in the district except Gallup.

2. Gallup-McKinley County Public Schools, "Building Needs," 8–13 (1971).

However, plaintiffs' analysis does include federal monies, and the disparity indicated above still obtains. Aside from this, plaintiffs assert that the district and the state have the obligation to provide an equal opportunity for the Indian students, i. e., the district is obligated to allocate some of its own resources for rural construction. The State Department of Education has suggested that the district's practice with regard to the expenditures of bond monies is questionable.[3] Any argument that seating capacity for Indian students has been increased by a percentage equal to the percentage increase in the city schools is specious, since the evidence shows that the city schools have superior facilities and an enrollment almost constant in size, while the rural predominately Indian schools have had rapidly growing enrollments and facilities in need of replacement.

There is also evidence that the district has had substantial cash balances for each of the last three years which can under the law be used for capital outlay. Yet, none of this money has been expended for construction at Indian schools.

The State Department of Education has acknowledged that to submit applications for P.L. 815 money is not sufficient to fulfill the district's obligation to educate the children of non-property owners.[4] In response to the state's directive that the district replace old and unfit buildings as soon as possible, the district has allocated from its recent $2,000,000.00 bond issue $1,200,000.00 (62 percent) for Indian schools. Of the balance, $730,000.00 will be spent in Gallup. This kind of allocation of monies will not comply with the state's directive and will, in view of the steadily increasing percentage of Indian students in the district, perpetuate the existing disparity.

The plaintiffs have also shown, and the defendants have admitted elsewhere[5] that the Indian schools suffer from overcrowding. The plaintiffs' mathematician calculated the number of unhoused students in 1971–72, i. e., those attending classes in portable or makeshift classrooms. Using permanent capacity, i. e., fully equipped and actually corresponding to the architect's designed capacity of a permanent school building with all necessary supporting facilities, the plaintiffs' expert determined that 24.9 percent of the Indians were unhoused, while 11.7 percent of the non-Indians were unhoused. Using normal capacity, which includes everything except makeshifts, he calculated that 17.5 per cent of the Indians were unhoused and 8.4 percent of the non-Indians were unhoused. These figures properly do not include portable classrooms, since many of those in the district were purchased with Johnson-O'Malley or Title I funds rather than from operational funds.

The local defendants' response to this is that the portable classrooms have meant classroom space for all children and that permanent buildings cannot be provided for those in portable classrooms because there is no federal construction money available. They also point out that plaintiffs' own figures show that, of the seating capacity in schools built since 1965, such capacity has been divided equally between Indi- and non-Indian children.

However, the current equal distribution perpetuates the discriminatory pattern by failing to take into account the much larger and steadily increasing Indian enrollment, so that existing disparities cannot be removed in the foreseeable future. It can be observed that the present disparity between unhoused Indian students and unhoused non-Indian students must have been very severe before 1965, if equal allocation of seating

---

3. New Mexico State Dept. of Education, "The Response to An Even Chance," 12 (1971).

4. *Id.* at 47.

5. Note 2, *supra.*

capacity since that time has left the Indian students still unhoused in the percentages shown.

Finally, the use of portable classrooms to furnish classroom space does not solve the problem, for there remains the lack of adequate supporting facilities such as cafeterias, vocational areas, restrooms and library space. Hence, the Indian students are, at the very least, overcrowded with regard to these facilities.

It can only be concluded that the local defendants have used their bond issues almost exclusively for the benefit of the Gallup schools, which has had the effect of denying a fair share (indeed, any real share at all) to those schools with overwhelmingly Indian enrollments.

The plaintiffs' showing of discrimination does not stop with proof that building needs have been fulfilled in a manner that discriminated against the Indian students. The allocation of equipment between Indian and non-Indian students also reflects a pattern of discrimination. Using the weighted average method and applying it to the district's statement of values for equipment, the plaintiffs showed that a total of $177.00 worth of equipment is allocated to each Indian student, while $232.00 worth of equipment is allocated to each non-Indian student. The statement of values includes all equipment the district has and thus also includes all Title I equipment, which is intended by law to be supplemental. The resulting disparity is $55.00 or 31 percent per pupil unfavorable to Indian students.

While the above computations excluded equipment in teacherages and most of the portable classrooms, a disparity of 25 percent remains even if such equipment is included.

It is admitted that teachers' salaries are generally higher in the City of Gallup than they are in the rural Indian schools. The district attributes this to the desire of the more experienced teachers to live in the City of Gallup instead of in the rural areas and claims that good teachers are induced to stay in the system by allowing them to transfer to city schools. The district does pay a rural increment to encourage teachers to work in the schools outside of the city. Nevertheless, the disparity in instructional expenditures does exist, and the district must take appropriate steps to fairly allocate instructional expenditures between non-Indian schools and Indian schools.

In the school year 1970–71, total per-pupil expenditures in the district from operational funds and with Johnson-O'Malley funds excluded showed an overall disparity in excess of 5 percent in favor of the non-Indian students in the district. The computations supporting this evidence were all based upon assumptions that favor the non-Indian students, so the above figure is a conservative conclusion as to the disparity in operational expenditures between the non-Indian students and the Indian students.

The evidence also shows that the state educational authorities gave sub-standard ratings to eight schools in the district, seven of which were Indian schools, the final school being the isolated school at Ambrosia Lake. While some of the ratings were based on technical matters, three of the seven Indian schools were given lower ratings for inadequate library collections or services and limited guidance services. This reflects a serious inequality.

Documents were introduced to show that students in the Indian schools are below the state-wide Indian average and the average of the district's non-Indian schools in terms of results on state-wide achievement tests and that a disturbing number of Indian students are retained and not promoted to the next grade. From the state of the record, it cannot be determined what, if any, of this is due to discriminatory practices within the district.

█ It must be recognized that the local defendants have confronted many difficulties since the district's formation. Because of improved roads and buses, the Indian students could stay at

home and attend the district schools instead of B.I.A. boarding schools, resulting in an increase of Indian student population of over 6,000 since 1958. It cannot be denied that this has strained the system's resources, especially in view of the dirth of P.L. 815 money and the difficulty of assigning teachers to isolated, rural areas. The local defendants point to these factors as the source of the district's problems with regard to adequately meeting the educational needs of Indian students. They contend that there has been no discriminatory purpose in the pattern of allocation of resources in the district. However, it is not necessary to find that there existed a discriminatory purpose or motive behind what they did. *See, e. g.,* Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Whatever their purpose, the evidence shows that the local defendants have consistently followed a pattern of resource allocation that discriminates against the Indian students.

The evidence shows that the district has failed to allocate per pupil expenditures on an equal basis throughout the system with the results that inequalities exist in school building investment, equipment allocation, provision of materials, supplies, and expenditures for instructional services. Further, Indian students in the district generally do attend overcrowded schools, some of which have not met state standards for accreditation. Thus, the plaintiffs have made a showing of discrimination against them and their class.

■ An equal educational opportunity, once the state has undertaken to provide it, is a right which must be made available to all on equal terms. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Hence, Indian students attending schools in the district may not be deprived of an equal educational opportunity on account of race. Yet this is precisely the effect of the consistent policies of the local defendants.

■ Under the New Mexico State Plan for Johnson-O'Malley funds, the school district attests that Indian students have educational opportunities and programs provided for them on the same basis as for other students in school. Under Title I provisions, the district must provide assurances of comparability designed to protect equal educational opportunity. 45 C.F.R. § 116.26. Further, under the Civil Rights Act, the district's receipt of all forms of federal assistance carries with it an assurance to the United States that the district will not engage in racial discrimination. 42 U.S.C.A. § 2000d–1. The plaintiffs and their class are beneficiaries of such statutory assurances and have standing to enforce them against the school district. Bossier Parish School Board v. Lemon, 370 F.2d 847 (5th Cir.), cert. denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967).

■ The local defendants have failed to meet their heavy burden of justifying the disparate allocation of resources as between Indian and non-Indian students. Hobson v. Hansen, 327 F.Supp. 844, 860 (D.D.C.1971). Their argument that the situation reflects nothing more than an urban-rural dichotomy is not persuasive. The evidence is clear that the district's Indian students as a whole have suffered because of the local defendants' allocation of financial resources.

Nor are the present efforts of the district to overcome disparities, such as the allocation of 62 percent of the recent bond issue to rural Indian schools, sufficient, for, as pointed out by the plaintiffs, this merely perpetuates past discrimination. *See* Henry v. Clarksdale School Dist., 409 F.2d 682 (5th Cir. 1969); Hobson v. Hansen, *supra.* The evidence is that the continuation of the current allocation of bond monies for construction purposes will not overcome the existing situation with the necessary deliberate speed.

■ The evidence is convincing that the current school board for the district is dedicated to preventing any inequities

in the allocation of the district's resources. There is no certainty, however, as to how long the present board might serve or what the composition of the board will be at any given time. The Court is loath to interfere in the administration of the educational process. However, because of the long-range aspects of the case, it is necessary to require that a plan designed to overcome the disparities existing because of the unequal allocation of construction and operational funds be submitted to the Court by the local defendants. The requirement of such a plan is no reflection upon the desire of the present board to achieve the goal of equality.

The claim that the state defendant should also be held to have participated in the discrimination is first premised upon the state defendant's responsibilities with regard to Impact Aid funds applied for by local school districts through the State Department of Education.

The state defendant's position is that the Impact Aid Law puts the responsibility for the administration of Impact Aid funds to those districts upon which the United States has placed financial burdens upon the Commissioner of Education of the Department of Health, Education and Welfare.

Under the statutory scheme set forth in the Impact Aid Law, the Commissioner, after consultation with the state and local educational agencies, makes a determination that there is federal property in the local agency district which places an unmet and continuing financial burden upon it. The local district then submits an application through the state agency to the Commissioner of Education. The state agency's responsibilities are shown by the evidence to be limited to checking the formal aspects of the application before it is forwarded to the Commissioner. The Commissioner makes appropriate payments directly to eligible local agencies. There is no federal or state provision that the state agency must monitor or review the use of these funds by the local district.

As for liability allegedly imposed upon the state defendant by virtue of the pertinent part of the School Code, N.M.Stat.Ann. §§ 77–2–1 to 10 (Repl. 1968), the plaintiffs have failed to establish that the state defendant should be liable for the acts of discrimination by the local district. Accordingly, this allegation as against the state defendant will be dismissed, and to the extent that the plaintiffs may be requesting that the state defendant be required to submit to the Court a plan to improve monitoring and evaluation of local practices with regard to the allocation of basic support funds, the request must be denied.

## II.

The question of whether Title I and Johnson-O'Malley funds have been misused in the Gallup-McKinley County School District arises out of the admitted obligation of the state and the local district to provide a basic educational program to all students in the district. The plaintiffs claim that, while Johnson-O'Malley and Title I monies are categorical or restricted aid which should be used only for supplemental programs that benefit the Indian students, the district has diverted these funds to supply basic support programs. Additionally, plaintiffs claim certain other violations of Title I, including misuse of Title I equipment and failure to properly implement the Title I regulation regarding parental involvement in Title I programs.

There is no question that Title I funds are intended to be used only for special programs to meet the needs of educationally deprived children, for this is expressly declared in 20 U.S.C.A. § 241a.

There is, on the other hand, serious disagreement as to the proper uses of those monies granted under Johnson-O'Malley.

The state of New Mexico has promulgated minimum standards for its school districts, and these standards are used

to evaluate schools for accreditation purposes. The plaintiffs challenge the expenditure of certain Johnson-O'Malley monies for health services, kindergartens, attendance services, administrative costs and the English as a second language program. These programs, it is claimed, are basic in nature according to the state's standards and should be funded from operational monies.

The Johnson-O'Malley Act authorizes the Secretary of the Interior to enter into contracts with states for the education of Indians. The Act's regulations provide that school districts that are eligible for Impact Aid are eligible for Johnson-O'Malley money only to meet *educational problems under extraordinary or exceptional circumstances.* 25 C.F.R. § 33.4(c); *see* U.S.Code Cong. & Ad.News, 3414 (1958). The plaintiffs claim that, in the absence of such circumstances, any district receiving Impact Aid may receive Johnson-O'Malley monies only to meet the special needs of Indian children for which Impact Aid is not intended, i. e., that the intent of Congress is to avoid duplication of use between Impact Aid funds and Johnson-O'Malley funds.

The evidence comports with the plaintiffs' interpretation of the above cited regulation. While the regulation might under certain circumstances allow Johnson-O'Malley funds to be used for basic support programs, there was in the instant case no attempt at justification by the local defendants for such use of Johnson-O'Malley money. Parenthetically, it can be observed that the Gallup-McKinley County District does not receive state equalization aid, which is designed to allocate funds to poor school districts to enable them to finance an adequate educational program. N.M. Stat.Ann. § 77–6–29(1) (Repl.1968) (Supp.1971). In addition, the New Mexico State Plan does not provide for Johnson-O'Malley funds to be used to finance basic support programs. The funds that were provided to the local defendants from the State Department of Education under contractual agreements between it and the Bureau of Indian Affairs were classified in the category of funds for special services.

The local defendants claim that, when Johnson-O'Malley project applications were made by them and approved by the state and federal authorities there could not be violations of the Act or its regulations so long as the funds received were used for the purposes stated in such applications. This, they assert, was done.

The local defendants' position ignores the crux of the problem. The important question is what programs are truly supplemental and entitled to be supported by categorical aid and what programs are basic support programs for which operational funds should be expended. The answer to this question determines the manner in which both Johnson-O'Malley and Title I funds may properly be spent.

■ It does not follow that plaintiffs' contention that the state minimum standards are the bench mark from which to determine what programs are basic and what programs are supplemental is entirely correct. The standards were promulgated by the state board for the purpose of accreditation, and state money is allocated to districts under a formula that is designed to help districts to meet the standards. The standards are an approximation of the kinds of facilities and programs needed, but they are not achieved in all the state's school districts. They cannot fairly be used to ascertain what services are normally and ordinarily furnished to all students in one district or to the students in all the districts in the state.

If the plaintiffs' charges are tested against what is ordinarily furnished to every student in the Gallup-McKinley County system, it can be seen that the plaintiffs are correct in their contention that certain programs classified as special programs to be paid for with Johnson-O'Malley or Title I funds are in fact part of the basic school program and

should be paid for with operational funds.

■ The testimony regarding those services ordinarily furnished to all students in the district, together with the audit of the Johnson-O'Malley assistance furnished to the district from mid-1969 through April of 1972 conducted by the Interior Department's Office of Survey and Review, are persuasive evidence that the local defendants have violated both Johnson-O'Malley and Title I by using these monies instead of operational funds to pay for basic programs.

In the area of health services, the evidence shows that Johnson-O'Malley and Title I funds have been used to pay for nurses. Nursing services are services ordinarily provided to all students in the district. The Acting Federal Projects Director in the district told the federal auditor that, beginning in fiscal year 1973, registered nurses will no longer be funded from Johnson-O'Malley assistance because they are considered part of the district's basic operational requirements. The auditor correctly concluded that registered nurses in the Johnson-O'Malley programs should be so reclassified. The previous classification under and payment from Johnson-O'Malley and Title I programs of registered nurses in the district was erroneous.

With regard to the furnishing of health services and other support services to the kindergarten program, the federal review team from the Office of Education found that the pro rata method used to charge Title I for these services was adequate, and it cannot be said that it has been established that the pro rata formula used overcharges Title I.

The district's kindergarten program is challenged as a case of partial supplanting. In the 1971–72 school year, the state under a pilot program funded one-half day kindergarten in those schools in the district which did not have Johnson-O'Malley or Title I kindergartens. Thus, all youngsters in the district had an opportunity to attend a kindergarten.

The Johnson-O'Malley and Title I kindergartens were full day programs, and the plaintiffs make no claim that the additional one-half day provided to children under these programs should be funded by operational monies. What is claimed is that, if the state funds one-half day programs for non-Title I and non-Johnson-O'Malley students, it is obligated to use operational monies to fund one-half day programs for all kindergarten students, i. e., the law requires that operational funds be used equally and fairly for all children in the district rather than concentrated on schools ineligible for Johnson-O'Malley or Title I funds.

■ Under other circumstances, this charge might be correct. However, where, as here, the program is not ordinarily furnished and, indeed, is a pilot program, it cannot be concluded that supplanting has occurred.

It should be noted in connection with the kindergarten program that the federal review team found that ineligible children were being allowed to attend Title I kindergartens. The team recommended that only children from eligible attendance areas should be served in the program. It is not considered necessary to rule on this issue, for the Court believes that this issue will be resolved by mutual agreement between the local and federal authorities.

■ Attendance services constitute another basic program which has been paid for by Title I or Johnson-O'Malley funds. The federal auditor recommended that this program be reclassified in the same manner as nursing services. During the course of the audit, she was advised by the Acting Federal Projects Director that Johnson-O'Malley funds would no longer be so used, but that the same people, with the new title of home-school coordinator, will be funded from Johnson-O'Malley. The Federal Projects Director also added that the work of these people will involve more community travel. There is

no evidence that this change is a semantic exercise designed to circumvent the intent of either Johnson-O'Malley or Title I.

With regard to counselors, it need only be said that the evidence establishes that they are part of the basic program and cannot be funded by either Title I or Johnson-O'Malley.

In the area of administrative costs, Johnson-O'Malley and Title I funds have also been used to supplant operational funds. Administrative aides are definitely a part of the basic program in the district. The district has three administrative aides, which is also the number required by the state standards for such a district. Johnson-O'Malley funds amount to 54 percent of the total expenditures for such personnel. The federal projects do require bookkeeping, and thus some amount of Johnson-O'Malley money can be used. Nevertheless, the excessive percentage is another example of improper allocation of Johnson-O'Malley funds.

■ The state standards also require that English as a second language be taught in any district where appropriate. In the Gallup-McKinley County district, where most of the kindergarten population speaks a language other than English, the program is properly offered. It has been funded entirely by Johnson-O'Malley and Title I money, but, since the evidence is that this program is not ordinarily provided to all students in this district or to all students in the state's other districts, it cannot be considered to be a basic program which should be funded from operational money. Indeed, this program appears to be an excellent example of the kind of program for which Title I and Johnson-O'Malley money should be used.

The federal review team's inspections verified the plaintiffs' charge that some Title I equipment was being misused in the district, particularly the equipment formerly housed in the district's media center. Until 1972, the center served the entire district, and the person in charge was improperly paid from Title I funds. All the Title I equipment and material was housed in the center and was in general use in the district. In 1972, such equipment was disbursed to the schools, and a centralized library of films was established. Some of the Title I equipment was distributed to ineligible schools, where much of it apparently still remains. Further, Title I films are widely used in ineligible schools. The state has urged the district to remove Title I equipment from ineligible schools, and federal authorities have indicated that it would be appropriate to relocate the equipment in eligible schools under 45 C.F.R. §§ 116.17(c), (g).

■ While the annual funding for the media center has been changed from Title I to operational funds, there has been a negligible effort to correct the misuse of equipment. Such equipment must be relocated in eligible schools, and Title I materials must be used only in Title I programs.

■ The final Title I violation leveled against the local defendants is that the local defendants have not properly used the parent advisory councils provided for under the Act's regulations. 45 C.F.R. § 116.17(o)(1). The plaintiffs concede that in this area there is little the Court can do. They urge, however, that the Court require that all council meetings in Indian areas be conducted with an interpreter, since Navajo people are reluctant to attend meetings conducted solely in English. The evidence presented with regard to this issue is not sufficient to warrant that the order desired by plaintiffs be entered, even though the presence of an interpreter at such meetings would be salutary.

In connection with the allegations concerning Johnson-O'Malley expenditures, it should be noted that no separate accounting of such expenditures was required of the district by the State Department of Education until 1972. Such

funds were comingled with regular operating funds, and the tracing of such funds was not in all cases possible. However, it is established by the federal audit and other evidence that the district has mishandled unexpended Johnson-O'Malley funds.

In fiscal year 1970, the school district retained $61,283.72 unexpended Johnson-O'Malley monies and did not, contrary to the New Mexico State Plan in effect that year, credit this surplus to the subsequent Johnson-O'Malley budget. In 1971, the amount so handled was $10,652.99. In 1972, the amount overpaid was $37,975.17, but the state's officials assured the federal auditor that these overpayments would be adjusted by the state officials by the end of fiscal year 1972. An additional $855.52 was actually non-Johnson-O'Malley expenditures erroneously charged to Johnson-O'Malley accounts in the district's records.

At the conclusion of this action no party made a request that these sums or amounts growing out of other Johnson-O'Malley violations be repaid.

Other than to ask that the district either restore the Title I media center as a proper program or discontinue the Title I equipment and materials as a Title I project and reimburse Title I for their value, neither have the plaintiffs asked that Title I be reimbursed. Nor have the federal defendants claimed in these proceedings that any money should be repaid to them for Title I violations.

 It appearing that the federal defendants are in the process of auditing, reviewing, and requiring restitution or reimbursement outside of the present action, the Court will not interfere in such procedures or try to direct them.

The Court finds that the local defendants have violated both the Johnson-O'Malley Act and the Title I Act and their respective regulations in the specific instances set forth above, and an appropriate order will be entered in this action to guard against repetition of such violations.

## III.

Against the federal and state defendants the plaintiffs have alleged failures to properly review and monitor Title I and Johnson-O'Malley programs.

As to the defendant state Superintendent of Public Instruction, the issue is whether he has established acceptable review and monitoring procedures for Title I or Johnson-O'Malley expenditures. Specifically it is charged that the state allows Johnson-O'Malley money to be calculated as basic support in the filing of the Title I comparability reports required by 45 C.F.R. § 116.26 when such monies should in fact be excluded from the comparability reports. The state defendant is also accused of failing to use the state minimum standards to determine whether Title I and Johnson-O'Malley monies are being used instead of operational revenues to provide basic educational services to Indian and Title I children. Further, it is contended that, while some steps have been taken to correct violations, the state has continued to approve improper applications and has allowed violations to remain in force.

The state defendant admits that he has responsibility to monitor and review the expenditure of federal funds granted under Title I and to participate with federal and local officials in the administration of the Johnson-O'Malley program but urges that he has fulfilled such responsibility.

45 C.F.R. § 116.26 requires that a local educational agency file through the state educational agency a comparability report showing that the applicant district is allocating its regular budgetary instructional funds equally to both Title I and non-Title I schools. In the comparability reports, which are submitted by the local defendants through the office of the state's Director of Title I, are included Johnson-O'Malley monies as part of the basic support or regular budgetary funds. It is plaintiffs' contention that Johnson-O'Malley monies should be excluded from Title I compar-

ability reports, for the inclusion of such funds pads the report for a district such as the Gallup-McKinley District and disguises real discrepancies in operational expenditures for instructional costs. In the defendant district, the state's policy in this regard is shown by the evidence to conceal disparities against Indians.

The state's Director of Title I asked in December of 1970 for a clarification of the procedures to be used in considering Johnson-O'Malley money with regard to supplanting and comparability reports. The Office of Education of H.E.W. responded that Johnson-O'Malley funds were regular support funds similar to P.L. 81–874 and state and local funds and should be treated as such in determinations relative to either supplanting or comparability under Title I. Hence, the state defendant, while admitting that Johnson-O'Malley funds are included in Title I comparability reports, asserts that such inclusion has not been a violation of any regulation. The state defendant's good faith reliance cannot be held against him.

This does not mean that such funds can continue to be so used. In 1972, the state began to require that the local defendants account for Johnson-O'Malley expenditures separately, and the federal authorities in H.E.W. are reexamining the policy concerning inclusion or exclusion of Johnson-O'Malley funds in Title I comparability reports. While the Court will decline the plaintiffs' request that it require the state to submit to it a proposed set of procedures to insure against this Title I violation, it will, in accordance with its holding that Johnson-O'Malley funds are intended only for supplementary programs for Indian children, find that Johnson-O'Malley funds may not properly be included in Title I comparability reports under 45 C.F.R. § 116.45(b).

With regard to the violations alleged by plaintiffs to be apparent on the face of the local defendants' Title I applications as submitted to the state, it is claimed that a proper review of the applications would have disclosed the violations. Specifically cited is the failure to utilize the state's minimum standards in determining whether the applications violated the provisions of 25 C.F.R. § 33.5(d) requiring that local districts provide an equal share of operational revenues to Title I children.

The evidence shows that each Title I application is reviewed three times at the state level before it is finally approved by the state director of the program, and the amount of money subsequently made available by the U. S. Office of Education is allocated to each applicant county or district. Further, the staff of the state director of the program conducts an annual visit to each Title I school, during the course of which any Title I violations are supposed to be discovered.

The state director has not scrutinized Title I applications to discover whether programs set forth therein are programs covered by the state minimum standards, relying instead on the application of these criteria by the state in the accrediting process. However, as indicated above, it cannot be said that the minimum standards are an absolute test of supplanting. The realities of the situation are such that the standards are not a hard and fast point of departure from which supplanting can be determined.

There is no doubt that the state's efforts to monitor and review Title I programs have been somewhat inadequate and that there have been undetected local violations, as disclosed by the federal authorities' investigations. Nevertheless, there will be no order requiring the submission to the Court of a set of procedures specifying how the state will in the future monitor and review Title I programs. Steps have already been taken by the state to correct violations. Further, the ongoing investigations by the federal authorities and conferences between the state and the federal authorities pursuant to 45 C.F.R. § 116.52 should satisfactorily resolve what prob-

lems there are without judicial interference in the administrative process.

As for the complaints against the state defendant revolving around the Johnson-O'Malley programs, it is admitted that the state has the responsibility to monitor and review such programs, and it is the authority with which the B.I.A. contracts to furnish Johnson-O'Malley programs to eligible local districts.

The issue of whether the state has violated any Johnson-O'Malley regulation by allowing the inclusion of such funds in Title I comparability reports has been adequately discussed above and need not be further analyzed here.

This leaves the question of whether the state has somehow been remiss in its responsibility to monitor and review Johnson-O'Malley programs to avoid supplanting.

It should be noted that plaintiffs blame the federal authorities for what they consider to be inadequate procedures and then charge that the state's procedures are similarly inadequate.

Beginning in 1972, the state has required separate accounting with respect to the expenditure of Johnson-O'Malley funds. The evidence is that the federal defendants, too, have instituted a change in the reporting procedure that will enable them to secure a statement from each school district showing the manner in which Johnson-O'Malley funds were spent, as well as the presently required statement of how the funds are going to be spent. Thus, the state and federal authorities have already tightened Johnson-O'Malley accountability requirements.

The evidence establishes that the local violations of Johnson-O'Malley have gone undetected by the state. Again, there are ongoing investigations and conferences on the existing problems that should resolve this matter, so that there is no necessity to enter an order in respect to the state's procedures with regard to the Johnson-O'Malley programs.

The refusal to issue an injunction against the state defendant does not mean plaintiffs' action has been in vain. It is obvious that the filing of the action has been a strong influence to cause investigation to be made and corrective action to be taken at all levels of government. By filing suit, the plaintiffs have focused attention on the problems and have caused the beginning, through the administrative process, of the reforms they seek. Thus, no decree of the Court is necessary to accomplish the purposes they desire accomplished.

In view of the above conclusion, it is not necessary to reach the other defenses advanced by the state defendant.

What has been said with regard to imposing certain requirements on the state defendants is equally applicable to the federal defendants. For the reasons set out below, no order will issue requiring the federal defendants to submit to the Court for its approval new Title I and Johnson-O'Malley regulations.

The plaintiffs admit that the matters here involved are committed to agency discretion. They charge, however, that the federal defendants' alleged failure to have adequate regulations delimiting procedures to foreclose the chance of misusing Title I or Johnson-O'Malley funds amounts to an abuse of discretion under 5 U.S.C.A. § 706.

In their concluding brief, federal defendants do not contest the Court's jurisdiction to review under the above-cited statute but take the position that the plaintiffs' proof fails to support their allegations. They admit that Johnson-O'Malley has been in a state of flux in recent years due to the effects of P.L. 815, P.L. 874, Title I of the Elementary and Secondary Education Act, and the Civil Rights Act of 1964, resulting in the need to change the philosophical concepts and purposes of Johnson-O'Malley expenditures. They state that they have updated 25 C.F.R. § 33.4(c) in response to the effect of passage of the Impact Aid Law. In late 1971 they also added 45 C.F.R. § 116.26(a). This regulation

requires that, for determining comparability, state and local funds include those used in determining fiscal effort in accordance with 45 C.F.R. § 116.45. This latter regulation defines fiscal effort by a local educational agency to include current expenditures per pupil by the local agency other than expenditures from funds derived from federal sources for which the local educational agency is required to account to the Federal Government directly or through the state educational agency.

It must be observed that, in view of the accountability requirements now imposed by the state and federal defendants, the federal defendants' brief implies that Johnson-O'Malley funds can no longer be used in computing Title I comparability reports.

In addition, the federal defendants point to their implementation of all pertinent regulations by affirmative actions with regard to both Title I and Johnson-O'Malley, i. e., the investigations, conferences, negotiations and auditing.

It is fair to say that the publication An Even Chance and the filing of this lawsuit stimulated federal action. However, that steps were taken prior to commencement of this action and have continued throughout its duration is a significant indication of the federal defendants' desire to correct existing problems in both programs. Further, such activities have already resulted in correcting many of the problems existing in the Gallup-McKinley County District's Title I and Johnson-O'Malley programs.

It is concluded that the federal defendants have been making and will continue to make every effort to insure that both programs are properly run.

Assuming that jurisdiction exists for the Court to require that any federal defendant submit to it a proposed draft of regulations designed to foreclose future violations of Title I and Johnson-O'Malley, no necessity to do so can be seen. The federal defendants' activities in this matter pursuant to existing statutory and regulatory administrative procedures have been shown by the evidence to be effective.

## IV.

There remains for disposition the question of costs. Plaintiffs have asked that they be awarded attorneys' fees. The amounts asked for are nominal, particularly in view of the extended nature of this litigation. It is recognized that the expense of the action has been substantial upon all parties to the action. However, it is concluded that an award of such fees is not necessary to do complete justice in this case, and the Court in its discretion will deny the request. Plaintiffs, however, are entitled to recover from the local defendants their other costs of action as provided by law.

No relief will be granted against the state defendant and the federal defendants. In accordance with the findings and conclusions contained in this Memorandum Opinion, plaintiffs' demand that the district be required to submit to the Court plans covering Title I and Johnson-O'Malley expenditures will be denied. However, to the extent that violations of Title I or Johnson-O'Malley have been found to exist, an injunction prohibiting the expenditure of Title I or Johnson-O'Malley funds in a manner contrary to the preceding findings and conclusions will issue, such injunction to be effective as to the 1973–74 school year and to cover such expenditures beginning with that year, whether or not such funds have already been budgeted.

It is the primary responsibility of the local officials to assure equal educational opportunities to all students in the district, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and therefore it is appropriate to order that the local defendants submit to the Court a comprehensive plan for correcting the disparities that have been found to be a denial of the plaintiffs' constitutional rights to equal protection of the laws.

In this connection, the federal defendants will be directed to furnish the investigatory and educational expertise of the Department of Health, Education and Welfare to both the Court and the parties to help frame a satisfactory remedy.

Unfortunately, the evidence in the case discloses that, whether it was intended or not, there has been a clear pattern of discrimination against the Indian students in the Gallup-McKinley County School District in capital outlay and operational expenditures, and there has been a diversion of Title I and Johnson-O'Malley funds for purposes for which they were not intended. The cumulative impact of the evidence mandates the conclusion that, in the Gallup-McKinley County School District, the Indian children truly have not been given an even chance.